UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

DENISE BARNES,                      )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )      1:24-CV-79-KAC-CHS
                                    )
CITY OF ATHENS, TENNESSEE;          )
                                    )
        Defendant.                  )

**MEMORANDUM OPINION AND ORDER DISMISSING ACTION**

This action is before the Court on "Defendant City of Athens, Tennessee's Motion for Summary Judgment" [Doc. 30]. For the reasons below, the Court grants Defendant's Motion for Summary Judgment in part, denies it in part, and dismisses the action.

**I.      Background[1]**

Defendant is a municipality that operates the Athens Police Department and employs its police officers [*See* Doc. 6 at 5]. Defendant has policies that guide officers' interactions with "mentally ill individuals" [*See* Doc. 30-11 at 3-7 (Deposition of Dr. Gregory Gilbertson ("G. Gilbertson Dep.") 60:23-25, 61:1-2, 71:10-17, 72:4-8)]. Plaintiff's expert witness Dr. Gregory Gilbertson described these policies as "quite good" [*See id.* at 3-4 (G. Gilbertson Dep. 60:23-25, 61:1-2)]. Dr. Gilbertson even opined that Defendant's policy "certainly" "sets objectively reasonable standards for officers" regarding treatment of mentally ill individuals [*Id.* at 7 (G. Gilbertson Dep. 72:4-8)].

---

[1] Because Defendant moved for summary judgment, the Court describes the facts in the light most favorable to Plaintiff Denise Barnes. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

Defendant also provides mental health training to its officers [*See* Doc. 30-2 at 2 (Declaration of Jason Garren ("J. Garren Decl." ¶¶ 7-8)]. Athens Police Department officers are certified by the Tennessee Peace Officer Standards Training ("POST") Commission [*Id.*]. The POST Commission "develops and enforces standards for law enforcement agencies statewide including physical, educational, and proficiency skills requirements for both employment and training" [*Id.*]. To maintain POST certification, officers undergo "forty (40) hours of annual in-service training" and must satisfy "all training and supervision requirements imposed by the POST Commission and the State of Tennessee for each year they have been employed" [*Id.*]. This means that, in alignment with state-wide POST standards, Athens Police Department officers received "one (1) hour of mental health [training] in 2018, two (2) hours in 2019, one (1) hour in 2020, one (1) hour in 2021, one (1) hour in 2022, one (1) hour in 2023, and half an hour in 2024" [*See* Doc. 30-3 at 24 (Declaration of Dr. Ken Lang ("K. Lang Decl."))]. And "[f]or each of these training sessions the objectives included content to 'identify, approach, and deal with individuals having possible mental health issues'" [*Id.* (quoting POST Training Lesson Plan Cover Sheets and Schedules 2018-2024)]. Officers also receive yearly de-escalation training [*Id.*].

On November 27, 2022, Plaintiff experienced a mental health crisis that required her to be hospitalized at Star Regional Medical Center [*See* Doc. 33 at 2 (citation omitted)]. While at the hospital, Dr. McDonald placed Plaintiff under a Certificate of Need, "authorizing involuntary psychiatric treatment" [*Id.*]. Sometime thereafter, hospital staff placed Plaintiff in Room Three, which is frequently used for psychiatric patients [*See* Doc. 33-4 at 8 (Deposition of Lesa Miller, RN ("L. Miller Dep.") 19:20-22, 20:4-10)]. Medical professionals placed Plaintiff in Room Three because it is the only room at the hospital equipped with an external lock and a camera, ensuring that the nursing staff could monitor Plaintiff [*See id.* at 8-9 (L. Miller Dep. 19:11-20:10)].

During her stay, Plaintiff "became more erratic" [*See* Docs. 33 at 2, 33-4 at 4 (L. Miller Dep. 11:3-7)]. And on November 28, hospital staff placed five (5) phone calls to the Athens Police Department over approximately five (5) hours [*See* Doc. 32[2]]. These phone calls resulted in the Athens Police Department visiting the hospital on four (4) separate occasions [*See* Doc. 33 at 2].

*First*, a nurse called because Plaintiff was "requesting that she go to jail," stating that "she d[idn't] want to wait in her room" [*See* Doc. 32 (8.48.25 Dispatch Call)]. The operator asked the nurse if Plaintiff was "causing a disturbance," and the nurse responded: "she's starting to, she's sitting at the nurse's station, refusing to go to her room, and I have patients in the hallway" [*Id.*]. Officer Parson responded and talked with Plaintiff briefly in her room [*See* Doc. 32 (J. Parson Body Cam (1))]. Then, he left [*Id.*].

*Second*, a nurse called because Plaintiff was "being very disruptive" and "hitting the walls with the bed" [*See* Doc. 32 (9.39.24 Dispatch Call)]. *Third*, before an officer responded, the nurse called back to ask if "there [was] an officer on the way" [*See* Doc. 32 (9.42.09 Dispatch Call)]. This time, the nurse told the operator that Plaintiff was "causing all kinds of trouble" in the emergency room [*Id.*]. Plaintiff was "beating the walls and the garage door with the bed" and "screaming" [*Id.*]. The nurse reported that she was "scared that [Plaintiff] was going to hurt herself" and Plaintiff was "screaming obscenities" and "scaring . . . other patients," including "children" [*Id.*].

When Officer Parson arrived this time, Plaintiff could be heard screaming from the hallway [*See* Doc. 32 (J. Parson Body Cam (2))]. Officer Parson helped hospital staff remove Plaintiff's bed from her room so that she could no longer bang it against the wall [*Id.*]. Officer Parson then

---

[2] Defendant manually filed three (3) oversized exhibits, and they are on file with the Court [*See* Doc. 32].

3

left Plaintiff's room and asked the nurses if Plaintiff "ha[d] been threatening" the staff [*Id.*]. The nurse confirmed that Plaintiff had "been yelling obscenities and threats at" staff [*Id.*]. Officer Parson then reentered Plaintiff's room and attempted to de-escalate Plaintiff's situation [*Id.*]. When he left, Plaintiff appeared to have calmed down [*Id.*].

*Fourth*, a nurse called the police because Plaintiff was "acting out again" [*See* Doc. 32 (12.20.55 Dispatch Call)]. The nurse explained that Plaintiff was "kicking the door so loudly that . . . patients [were] getting scared" [*Id.*]. Officers Chandler and Eubanks responded to this call [*See* Doc. 32 (M. Chandler Body Cam (1))]. By the time Officers Chandler and Eubanks arrived, Plaintiff was no longer kicking the door [*Id.*]. She was relatively quiet [*Id.*]. Nonetheless, the nurses asked Officer Chandler to speak with Plaintiff because "she was kicking that door so loud you c[ouldn't] even hear yourself think out here" [*Id.*]. The nurses further stated that the "first time" officers talked to Plaintiff "she at least calmed down for ten (10) or fifteen (15) minutes" [*Id.*].

Officers Chandler and Eubanks entered Plaintiff's room, asked her "what [was] going on," and explained to her that she needed to "calm down" so that she could "get help here" [*Id.*]. Officer Chandler told Plaintiff that her "kicking" and "screaming" were "causing a nuisance to the other people . . . trying to get treated" [*Id.*]. Plaintiff began to sob [*Id.*]. Officers Chandler and Eubanks left the room [*Id.*]. Then, Plaintiff began to yell, and Plaintiff could be heard banging on her door from the hallway [*Id.*]. Officer Chandler told Plaintiff to "quit yelling" and "beating on the door" [*Id.*]. Officer Chandler then called Sergeant Thompson who told her not to arrest Plaintiff at the time [*Id.*]. Officers Chandler and Eubanks left [*Id.*].

4

Afterwards, Plaintiff began to break items in her room [*See* Doc. 32 (Hospital Security Camera Video)]. She threw a keyboard tray and her latrine against the wall until both items broke [*Id.*]. She also banged on the wall repeatedly with her hands and feet and screamed [*Id.*].

***Finally***, the hospital called the Police Department a fifth time. This time, staff informed the police that Plaintiff was "armed" with "everything that she's broken in the room" and was "a danger to herself" [*See* Doc. 32 (13.30.13 Dispatch Call)]. Sergeant Thompson responded to this call himself. As he entered the hospital, Plaintiff could be heard screaming [*See* Doc. 32 (S. Thompson Body Cam)]. Sergeant Thompson walked into Plaintiff's room and said: "Hey, quit screaming" [*Id.*]. Plaintiff went to grab Sergeant Thompson, and he responded: "Don't touch me" [*Id.*]. He then told Plaintiff, "You got like twenty-seven (27) minutes before someone gets down here and transports you," referring to Plaintiff's scheduled transport to Saint Thomas Behavioral Health in Nashville, Tennessee [*Id.*]. He then asked her, "Can you stay calm for like twenty (20) minutes?" [*Id.*]. Plaintiff responded, "no" [*Id.*]. Plaintiff then said "[y]ou take me" and grabbed Sergeant Thompson's leg [*Id.*]. Sergeant Thompson arrested Plaintiff for disorderly conduct, and she continued to scream [*Id.*].

Officers Chandler and Eubanks transported Plaintiff to the McMinn County Jail [*See* Doc. 30-5 at 11 (Deposition of Mark Barnes ("M. Barnes Dep.") 72:8-9)]. She remained there for "about a week" while jail staff attempted to find a spot for her at an inpatient mental health facility [*See id.*]. Plaintiff was transferred to Moccasin Bend Mental Health Institute in Chattanooga, Tennessee [*See id.*]. Around December 22, Moccasin Bend discharged Plaintiff after she received mental health treatment [*See id.* at 13 (M. Barnes Dep. 76:6-8)].

Before the Court now is Defendant's motion for summary judgement [Doc. 30]. Defendant argues that it is entitled to summary judgment on Plaintiff's federal Section 1983 claims because

5

no constitutional violation occurred and Plaintiff cannot establish municipal liability [*See* Docs. 30 and 31]. It also argues that any state claims cannot survive [*See* Doc. 31 at 23-25]. Plaintiff opposed, arguing that Plaintiff's Section 1983 claims against Defendant survive summary judgment on a failure-to-train theory [*See* Doc. 33 at 10, 14-15]. She also argued that the state claims survive under the "Tennessee pleading standard" [*See id.* at 18]. Defendant replied [Doc. 34].

## II.     Analysis

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences from those facts in her favor. *See Matsushita*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907. The moving party bears the burden of demonstrating that no genuine dispute of material fact exists. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 323 (6th Cir. 2023) (citation omitted). If the moving party satisfies this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *See Zakora v. Chrisman*, 44 F.4th 452, 464 (6th Cir. 2022) (quotation omitted). "A genuine issue for trial exists only when there is sufficient 'evidence on which the jury could reasonably find for'" the nonmoving party. *See Nat'l Satellite Sports, Inc.*, 253 F.3d at 907 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 249 (1986)).

"[F]or a municipal entity to be liable [under 42 U.S.C. § 1983], a plaintiff must show: (1) a deprivation of a constitutional right; and (2) that the municipal entity is responsible for that deprivation." *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015) (internal citation omitted).

### A. Defendant Is Entitled To Summary Judgment On Plaintiff's Unlawful Arrest Claim Because No Constitutional Violation Occurred.

Defendant is entitled to summary judgment on Plaintiff's unlawful arrest claim because Sergent Thompson had probable cause to arrest her. Under the Fourth Amendment, an officer may conduct a warrantless arrest "where there is probable cause to believe that a criminal offense has been or is being committed." *Ouza v. City of Dearborn Heights*., 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

At the time Sergeant Thompson arrested Plaintiff, he had probable cause to believe that she had engaged in disorderly conduct [*See* Doc. 32 (S. Thompson Body Cam)]. *See also* Tenn. Code Ann. § 39-17-305. Under Tennessee law, a person is guilty of disorderly conduct when she "makes unreasonable noise that prevents others from carrying on lawful activities." Tenn. Code Ann. § 39-17-305(b). For several hours on and off, Plaintiff (1) screamed loudly, (2) kicked and hit her door, (3) rammed her bed into her door, (4) threw and hit a keyboard tray against her door until it broke, and (4) threw her latrine against her door until it broke [*See* Doc. 32]. There was probable cause to believe that these noises were unreasonable. And there was probable cause to believe that these unreasonable noises were disruptive to hospital staff and prevented them from "carrying on lawful activities." *Id.* For starters, hospital staff said as much and demonstrated as much when they called law enforcement [*See* Doc. 32]. And there was sufficient evidence that Plaintiff's behavior scared the hospital's other patients and hindered the hospital staff's ability to treat other patients [*See* Doc. 32 (9.42.09 Dispatch Call), (12.20.55 Dispatch Call), (M. Chandler Body Cam (1) ("She was kicking that door so loud you c[ouldn't] even hear yourself think out here."))].

Plaintiff also invokes the Due Process Clause of the Fifth and Fourteenth Amendments as they relate to "the right not to be deprived of liberty without due process of law" [*See* Doc. 1-2 at ¶¶ 12, 17]. But "[w]here a particular Amendment 'provides an explicit textual source of

7

constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Therefore, her claim for unreasonable seizure is properly addressed under the Fourth Amendment, not substantive due process. *See id* at 273-75. And any procedural due process claim fails because the only process she was due before arrest was a finding of probable cause. *See Beck v. State of Ohio*, 379 U.S. 89, 91 (1964) (explaining that officers must have probable cause before conducting a warrantless arrest). Because Sergeant Thompson had probable cause to arrest Plaintiff, she cannot establish a constitutional violation, and her unlawful arrest claim fails.

### B. Defendant Is Also Entitled To Summary Judgment On Plaintiff's Remaining Section 1983 Claims.

Under Plaintiff's failure-to-train theory of liability, a municipality can be "responsible" for a constitutional violation if "a policy of inadequate training" exists. *See Baynes*, 799 F.3d at 620 (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). A "municipality's culpability for a deprivation of rights is at its most tenuous where a . . . claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To succeed on a Section 1983 failure to train claim, Plaintiff must show that: (1) the relevant training Defendant provided was inadequate for the tasks performed; (2) the inadequacy was the result of Defendant's deliberate indifference; and (3) the

inadequacy was closely related to or actually caused the constitutional violation alleged. *See Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citation omitted).

Plaintiff's Fourteenth[3] Amendment claims relating to allegedly inadequate medical care fail under this rubric. At bottom, Plaintiff argues that the POST training Sergeant Thompson received was constitutionally inadequate[4] [*See* Doc. 33 at 14-16]. POST training includes mental health and de-escalation training designed specifically to aid officers in their interactions with mentally ill individuals [*See* Doc. 33-3 at 24 (K. Lee Decl.)]. And Plaintiff's own expert described Defendant's policies as "quite good," "objectively reasonable standards for officers" regarding treatment of mentally ill individuals [*See* Doc. 30-11 at 3-4, 7 (G. Gilbertson Dep. 60:23-25, 61:1-2, 72:4-8)]. To the extent that Sergeant Thompson failed to adhere to Defendant's Department policy, [*see* Docs. 33 at 8-9, 12-14; 30-11 at 10-11 (G. Gilbertson Dep. 82:20-25, 83:1-3)], that is insufficient alone to establish a constitutional violation, *see Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022). And while a failure by Sergeant Thompson to follow the training and policies Defendant provided could help to establish liability for Sergeant Thompson, it cuts against any

---

[3] Plaintiff cites to both the Eighth and Fourteenth Amendments to support her inadequate medical care claims [*See* Doc. 1-2 at ¶¶ 12, 17, 24, 33]. Because Plaintiff was a pretrial detainee at the relevant time, her claims are covered by the Fourteenth Amendment. *See Lawler ex rel. Lawler v. Hardeman Cnty., Tenn.*, 93 F.4th 919, 926 (6th Cir. 2024). Even if the Eighth Amendment applied, her claims would not survive summary judgment for the reasons discussed below.

[4] Plaintiff notes that "Sgt. Thompson did not list crisis intervention training as part of his yearly in-service state required training" [Doc. 33 at 17]. This is incomplete and misleading When Sergeant Thompson was asked "what training is required for an officer with the Athens Police Department on a yearly basis," he responded "[o]n a yearly basis we have inservice with state requirements that we have to go through . . . like first aid, EVOC, firearms, all the autism awareness and use of force. There's a whole list of stuff" [*See* Doc. 33-3 at 3 (Deposition of Sergeant Shaun Thompson ("S. Thompson Dep.") 10:5-12)]. Seargeant Thompson's failure to specifically identify crisis and mental health training in response to this question does not mean that he did not receive that training. Sergeant Thompson was POST certified [*See* Doc. 30-2 at 2 (J. Garren Decl. ¶¶ 7-8)]. And to be POST certified, he had to complete this training [*See* Doc. 30-3 at 24 (K. Lee Decl.) (noting that yearly POST training specifically includes mental illness, de-escalation, and use-of-force training)].

liability for Defendant under a failure to train theory. A municipality "cannot be liable under a theory of respondeat superior; it can only be held liable for its own wrongdoing." *See Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 323 (6th Cir. 2023) (cleaned up). Accordingly, Defendant is entitled to summary judgment on Plaintiff's inadequate medical care claims.

### C. The Court Declines To Exercise Supplemental Jurisdiction Over Any Remaining State Law Claims.

The Court's original jurisdiction rested only on Plaintiff's Section 1983 claims [*See* Doc. 1-2 at 2-5]. *See* 28 U.S.C. § 1331. "[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach" any "state-law claims." *Burnett v. Griffith*, 33 F.4th 907, 915 (6th Cir. 2022) (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014)). Because the Court dismisses Plaintiff's Section 1983 claims, the Court declines to exercise supplemental jurisdiction over any remaining state law claims. *See id.* Because the Court does not reach the merits, the Court dismisses any state law claims without prejudice.

### III. Conclusion

For the above reasons, the Court **GRANTS IN PART** "Defendant City of Athens, Tennessee's Motion for Summary Judgment" [Doc. 30] and **DISMISSES** Plaintiff's Section 1983 claims against Defendant **WITH PREJUDICE**. The Court **DISMISSES** any remaining state law claims against Defendant **WITHOUT PREJUDICE**. No claims remain in this action. Accordingly, an appropriate judgment shall enter.

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge